**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | | |
|---|---|---|
| DAVID BILLS, | | |
| Plaintiff, | | No. 19-CV-3021-CJW |
| vs. | | |
| CACTUS FAMILY FARMS, LLC; CRE HOLDINGS, LLLP; SMG MANAGEMENT LLC; CACTUS OPERATING, LLC., | | **ORDER** |
| Defendants. | | |

_____

**TABLE OF CONTENTS**

I.    BACKGROUND ................................................................................ 3

    A.    Parties ................................................................................ 4

    B.    Pork Production Process ....................................................... 4

    C.    Plaintiff's Employment with Cactus Family Farms ................. 5

    D.    Claims and Procedural Posture ............................................. 6

II.   MOTION TO AMEND .................................................................... 7

III.  MOTION FOR SUMMARY JUDGMENT .......................................... 9

    A.    Summary Judgment Standard ................................................ 9

    B.    Unresisted Dismissals .........................................................11

C.     Parties' Arguments....................................................................12

D.     FLSA.............................................................................................13

    1.     Statutory Framework.....................................................13

    2.     Interpretation and Application of the Statute ..........14

    3.     Applicability of the Exemption Here ....................17

        a.     Primary Agriculture..............................17

        b.     Secondary Agriculture..........................24

            i.     By a Farmer...............................25

            ii.     On a Farm..................................27

E.     Iowa Wage Payment Collection Act ..........................................29

IV.    CONCLUSION .............................................................................30

This matter is before the Court on defendants' Motion for Summary Judgment (Doc. 22), plaintiff's Motion for Partial Summary Judgment (Doc. 24), and defendants' Motion for Leave to Amend Answer to Add Affirmative Defense ("Motion to Add Affirmative Defense") (Doc. 29). Plaintiff timely resisted defendants' Motion for Summary Judgment (Doc. 37) and defendants filed a timely reply (Doc. 40). Defendants timely resisted plaintiff's Motion for Partial Summary Judgment (Doc. 39) and plaintiff filed a timely reply (Doc. 42). Plaintiff also timely resisted defendants' Motion to Add Affirmative Defenses (Doc. 34) and defendants filed a timely reply (Doc. 41). Defendants requested an oral argument on their Motion for Summary Judgment. (Doc. 22). On June 2, 2020, the Court heard oral arguments on all pending motions. (Doc. 45). The Court considers this matter fully submitted.

For the following reasons the Court finds that, as a matter of law, plaintiff was engaged in primary and secondary agriculture and thus, falls within the agricultural employee exemption to the Fair Labor Standards Act's ("FLSA") overtime pay requirement. Thus, defendants' Motion for Summary Judgment is **granted** (Doc. 22) and plaintiff's Motion for Partial Summary Judgment is **denied** (Doc. 24). The Court also **denies** defendants' Motion to Add Affirmative Defense (Doc. 29).

## I.    BACKGROUND

This case involves the FLSA's agricultural exemption to the overtime pay requirement and this matter is primarily before the Court on a motion for summary judgment. The parties agree that there are not significant factual disputes and instead assert this matter raises a question of statutory interpretation. Thus, the following facts are undisputed unless otherwise indicated. The Court will consider additional facts as they become relevant to the Court's discussion.

### A.    Parties

This matter involves several defendants (collectively "defendants") that are all subsidiaries of Cactus Pork Group, LLC ("Cactus Pork Group"). First, Cactus Family Farms, LLC ("Cactus Family Farms" or "Cactus") is a pork production company that is headquartered in Amarillo, Texas with its pork operations based in Osceola, Iowa. (Doc. 37-1, at 5). Next, CRE Holdings, LLLP ("CRE") is a real estate holding company that owns real estate in Iowa. (*Id.*, at 6). CRE has two limited partners, which are wholly owned subsidiaries of Cactus Pork Group, and one general partner. (*Id.*). SMG Management, LLC ("SMG") is CRE's general partner. (*Id.*). Cactus Operating, LLC ("Cactus Operating") is a common paymaster for Cactus Pork Group subsidiaries. (*Id.*). Cactus Operating provides Cactus Family Farms with payroll, benefits, accounting, and human resource support. (*Id.*).

Plaintiff is an individual who was employed by Cactus Family Farms as an Animal Care Auditor from February 13, 2017, through the end of May 2018. (*Id.*, at 7).

### B.    Pork Production Process

Cactus Family Farms is a pork production company. (Doc. 36, at 1). Its business consists of several areas related to pork production and its properties include breeding facilities, nursery facilities, and finishing facilities. (*Id.*).

All the pigs Cactus Family Farms owns are born on one of its sow farms. (*Id.*, at 12-13). Each piglet remains on a sow farm for approximately three weeks. (*Id.*). When the piglets are three weeks old they are loaded onto a truck and transported to either a nursery or to a wean-to-finish farm. (*Id.*). Piglets that are sent to nursery farms are transported from the nursery farm to a finishing farm when the piglet is between six to eight weeks old. (*Id.*). Piglets that are sent to wean-to-finish farms do not need to be transported again until they are ready for slaughter and processing. (*Id.*, at 13). When the pigs reach their target market weight they are loaded onto a truck and transported to

4

a meat packing facility for processing. (*Id.*). In other words, the pigs are loaded onto a truck and transported to different farms and then to the processing facility at least two times throughout their lives. Moving the pigs to different barns reduces the risk of the pigs becoming sick and spreading disease and addresses biosecurity concerns.

Cactus Family Farms owns the pigs from the pigs' births until they are delivered to the processing plant. (Doc. 37-1, at 2). As discussed above, Cactus Family Farms breeds the pigs at its own sow farms and then delivers the pigs to another farm. (Doc. 36, at 13). The farms are owned by either Cactus Family Farms or by independent contractors. (*Id.*). If the pigs are delivered to an independent contractor, the contractor then feeds, waters, cares for, and otherwise raises the pigs until the pigs are ready for processing. (*Id.*, at 12). In exchange, Cactus Family Farms pays the contract growers for their barn space and services, but it retains title to the pigs throughout the entirety of the pigs' lives. (*Id.*).

### C.  *Plaintiff's Employment with Cactus Family Farms*

Plaintiff started working for Cactus Family Farms in May 2015, when Cactus Family Farms purchased plaintiff's former employer, Swine Graphics Enterprises ("Swine Graphics"). (Doc. 36, at 1). At first, plaintiff's duties were similar to the duties he performed as Resource Manager for Swine Graphics. (*Id.*). In February 2017, Cactus moved plaintiff into a new position with Cactus Family Farms. (*Id.*, at 2). The new position was called Auditor of Site Compliance. (*Id.*, at 2). The job title was later changed to Animal Care Auditor, but the job responsibilities remained the same. (*Id.*).

As an Animal Care Auditor plaintiff performed vaccination assessments, transportation and biosecurity audits, power washing assessments, and load assessments. (*Id.*, at 10-16). Plaintiff estimates that he spent approximately 80 percent of his time conducting load assessments and spent the remaining 20 percent of his time performing power-washing assessments, vaccination assessments, and biosecurity truck swabbing.

5

(*Id.*, at 10).  Plaintiff conducted most of the load assessments at finishing farms owned by Cactus Family Farms or contract growers.  (*Id.*, at 19).  As a load assessor plaintiff assessed the truckers, trucks, and load crews that were used to transport pigs to make sure the crews were following proper biosecurity and safety protocols.  (*Id.*).  For example, plaintiff made sure loading chutes were in place, there was adequate lighting in the barns, and that conditions were otherwise proper for loading pigs onto transport trucks.  (*Id.*).  Plaintiff also observed how load crews moved the animals, sorted the animals, and handled the pigs.  (*Id.*).  The remainder of his time with load assessments was spent observing the truck driver to make sure the driver did not abuse the animals. (*Id.*).

### D.    Claims and Procedural Posture

On February 07, 2019, plaintiff filed his complaint in the Iowa District Court for Hamilton County.  (Doc. 1-1).  Plaintiff brought claims for violations of the FLSA (Count One) and the Iowa Wage Payment Collection Act ("IWPCA" or "IWPCL").  (*Id.*, at 3-4).  According to plaintiff, he "regularly worked for Defendant in excess of forty hours per week," but "was not compensated for the hours he worked each week in excess of forty at a rate at least one and one-half times the regular rate at which Plaintiff was employed." (*Id.*, at 4-5).  On May 9, 2019, defendants removed the case from the Iowa District Court to the United States District Court for the Northern District of Iowa.  (Doc. 1).  On April 17, 2020, defendants moved for summary judgment.  (Doc. 22).  On April 17, 2020, plaintiff also moved for partial summary judgment.  (Doc. 24).  Both parties request the Court find in their favor on the question of whether plaintiff is exempt from the FLSA overtime requirement under the agricultural exemption.  Defendants also allege plaintiff's IWCPA claim is dependent on his FLSA claim and they move for summary judgment on plaintiff's IWPCL claim as well.  (Doc. 22-1, at 24).  Thus, even though

6

the motions appear as cross summary judgment motions, they only require the Court to consider a single issue.

On April 24, 2020, defendants moved for leave to amend their answer to assert an additional affirmative defense. (Doc. 29, at 2). Plaintiff resisted the motion (Doc. 34) and defendants filed a reply (Doc. 41).

The Court will first consider defendants' motion to amend before turning to the cross motions for summary judgment.

## II.    MOTION TO AMEND

Defendants move for leave to amend their answer to add an affirmative defense. (Doc. 29, at 1). Specifically, defendants seek to amend their original answer to add an affirmative defense classifying plaintiff as exempt from the FLSA overtime requirement as an administrative employee. (*Id.*).

When a party moves for leave to amend after a court's deadline for amendment, the request must satisfy Federal Rules of Civil Procedure 15(a) and 16(b). "The interplay between Rule 15(a) and 16(b) is settled" when "a party files for leave to amend outside of the court's scheduling order." *Transamerica Life Ins. Co. v. Lincoln Nat. Life Ins. Co.*, 590 F. Supp. 2d 1093, 1098 (N.D. Iowa 2008) (quoting *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 715 (8th Cir. 2008)). "[T]he movant must first show good cause to amend the scheduling order, as required by Rule 16(b); only then will the court consider whether the party is permitted to amend its pleadings under Rule 15(a)." *East Iowa Plastics, Inc. v. PI, Inc.*, No. C12-2088, 2014 WL 4463232, at *2 (N.D. Iowa Sept. 10, 2014).

Courts consider several factors when deciding whether a party has shown good cause under Rule 16(b). "The primary measure of good cause is the movant's diligence in attempting to meet the [scheduling] order's requirement." *Sherman*, 532 F.3d at 716-17 (quoting *Rahn v. Hawkins*, 464 F.3d 813, 822 (8th Cir. 2006)). Courts may also

7

consider the prejudice to the nonmovant resulting from a modification of the scheduling order, but prejudice will not be considered "if the movant has not been diligent in meeting the scheduling order's deadlines." *Id.* at 717. In the Eighth Circuit, "Rule 16(b) rulings focus in the first instance (and usually solely) on the diligence of the party who sought modification of the order." *Id.*

The Court will first consider defendants' diligence in meeting the scheduling order's deadlines. The Court finds that defendants were not diligent in seeking to amend their complaint. On August 1, 2019, the Court entered a scheduling order establishing necessary deadlines. (Doc. 14). According to the scheduling order the deadline to amend pleadings was September 13, 2019, and discovery was to be completed by March 6, 2020. (*Id.*). Defendants did not file their Motion to Amend until April 24, 2020, or approximately nine months after the deadline to amend pleadings had passed. (Doc. 29).

In some situations, however, a defendant may not know of an available defense until discovery occurs. In those cases, the Court expects a party will request leave to amend their pleadings and answers at the earliest possible time. Here, defendants' Motion to Amend shows that they did not move to amend their answers until approximately a month and a half after discovery closed, during which time they could have moved to amend. Also, defendants fully briefed the administrative exemption question in their motion for summary judgment which was filed on April 17, 2020, or a full week before defendants filed their Motion to Amend. (Doc. 22). This provides further evidence that they were aware of the administrative exemption at least by the time discovery closed. Thus, even if defendants could not have known the administrative exemption was a viable defense until after the close of discovery, there is no evidence they acted diligently to move to amend their answers until a month and a half after discovery closed and a full week after they had fully briefed the issue elsewhere.

Defendants, however, should have known about the administrative exemption defense before the deadline for motions to amend pleadings. As the employer, defendants should have been knowledgeable about plaintiff's job and his responsibilities before discovery began. Defendants should also have had full access to his job description, reports, and records before discovery commenced. In other words, they should have had all the information that was needed to determine what exemptions applied. There is no evidence, however, that defendants moved to amend its answers at any point before April 24, 2020. Thus, because defendants had the information needed to assert the administrative exemption defense but did not make the assertion, the Court finds they were not diligent in meeting the scheduling order's deadlines.

The Court need not consider whether there was prejudice to the nonmoving party because the Court finds defendants were not diligent in moving to amend answers. *Sherman*, 552 F.3d at 717. Thus, defendants' Motion to Amend is **denied**, and the Court will not consider the administrative exemption. The only remaining issue is whether plaintiff is exempt from the FLSA's overtime provision under the agricultural exemption, which the Court considers next.

### III. MOTION FOR SUMMARY JUDGMENT

#### A. Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Alternatively, a party may show that "the materials cited do not establish the absence or

9

presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). More specifically, a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted), or "when a reasonable jury could return a verdict for the nonmoving party on the question," *Wood v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal quotation marks and citation omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it requires "a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (citation and internal quotation marks omitted).

In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Matsushita*, 475 U.S. at 587-88 (citation omitted); *see also Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009) (stating that in ruling on a motion for summary judgment, a court must view the facts "in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them") (alteration in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). A court does "not weigh the evidence or

attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citation omitted). Rather, a "court's function is to determine whether a dispute about a material fact is genuine[.]" *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996). When considering a motion for summary judgment, the court "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

A matter "involving only questions of law [ ] 'is particularly appropriate for summary judgment.'" *Jimenez v. Duran*, 287 F. Supp. 2d 979, 983 (N.D. Iowa 2003) (quoting *TeamBank, N.A. v. McClure*, 279 F.3d 614, 617 (8th Cir. 2002)). Questions of statutory interpretation are primarily legal questions and are appropriate for summary judgment, particularly in cases when the facts are undisputed. *Baldwin v. Iowa Select Farms, L.P.*, 6 F. Supp. 2d 831, 835 (N.D. Iowa 1998). "Thus, because the central issue before the court is essentially legal—statutory interpretation—summary disposition may be particularly appropriate." *Id.*

### B.     Unresisted Dismissals

As a preliminary matter, defendants assert that all claims against defendants CRE, SMG, and Cactus Operating should be dismissed in their entirety. (Doc. 22-1, at 10). According to defendants, CRE, SMG, and Cactus Operating "were not Plaintiff's employer nor did [they] act in a manner giving rise to an employment relationship." (Doc. 22-1, at 9). Defendants assert that CRE, SMG, and Cactus Operating "were not involved with the management or operations of Cactus" at any relevant times, nor did they hire or fire Cactus employees, control work schedules or employment conditions, or determine employee's pay. (*Id.*). Plaintiff "does not resist summary judgment as to [CRE, SMG, and Cactus Operating]." (Doc. 37, at 3).

Courts may grant summary judgment as to unresisted claims if the motion is properly supported. *See, e.g.*, *White v. Kautzky*, 269 F. Supp. 2d 1054, at 1057, 1060

(N.D. Iowa 2003) (affirming magistrate judge's grant of summary judgment "because the motion was properly supported and unresisted as to the class action claims[.]"). Here, the unresisted motion for judgment in favor of CRE, SMG, and Cactus Operating is properly supported. Under the FLSA employers must pay covered employees overtime pay equal to one and a half times their regular hourly rate for hours worked in excess of forty hours per week. *See* 29 U.S.C. § 207(a)(1). An employer "includes any person acting directly or indirectly in the interest of an employer in relation to an employee[.]" *Id.* § 203(d). Defendants produced affidavits that state Cactus Family Farms, and not CRE, SMG, or Cactus Operating, was plaintiff's employer. For example, Bradley Hastings, the co-CEO of Cactus Feeders, Inc. (Cactus Family Farm's parent company), stated in his affidavit that Cactus Family Farms employed plaintiff. (Doc. 22-3, at 110). Plaintiff also provided deposition testimony that he did not receive any direction from CRE, SMG, and Cactus Operating. (*Id.*, at 42). There is no evidence in the record that establishes CRE, SMG, or Cactus Operating employed plaintiff, and the Court **grants** summary judgment as it applies to CRE, SMG, and Cactus Operating.

Thus, the only remaining claims are plaintiff's FLSA and IWPCL claims against defendant Cactus Family Farms ("defendant").

### C. *Parties' Arguments*

Both defendant's Motion for Summary Judgment and plaintiff's Motion for Partial Summary Judgment ask the Court to consider essentially the same question: whether plaintiff was an agricultural employee and thus exempt from the FLSA's overtime pay requirements. If plaintiff was an agricultural employee, defendant need not pay him overtime under the FLSA. If plaintiff is not an agricultural employee, however, he may be entitled to overtime pay. Both motions ask the Court to consider the same question and thus, the Court will discuss the arguments generally and not as they apply to the individual motions.

12

Defendant makes several arguments in support of its motion for summary judgment. First, defendant argues plaintiff should not be entitled to overtime under the FLSA. Specifically, defendant argues plaintiff is engaged in both primary and secondary agriculture and is thus an agricultural employee. (Doc. 22-1, at 12-19). Defendant also argues that plaintiff is not entitled to overtime because he was exempt from the overtime pay requirement under the FLSA's administrative exemption. (Doc. 22, at 1-2). Next, defendant asserts plaintiff's IWPCL claim is based on the FLSA claim and must fail because the FLSA claim fails. (*Id.*, at 2).

Plaintiff disagrees. According to plaintiff, he is not an agricultural worker and is not exempt from FLSA overtime pay requirements. (Doc. 28, at 7). Plaintiff also argues the administrative exemption does not apply because defendant failed to raise it as an affirmative defense and, alternatively, because plaintiff's responsibilities do not fall within the administrative exemption. (Doc. 37, at 13). Last, plaintiff asserts he worked more than 40 hours per week and is owed overtime pay. (Doc. 1-1, at 4-5).

### D. FLSA

#### 1. Statutory Framework

Under the FLSA,

> [N]o employer shall employ any of his employees who in any workweek is engaged in commerce, or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1). In other words, "[t]he FLSA generally requires that covered employees must be paid one-and-one-half times their regular hourly rate for hours worked in excess of forty per week." *Jimenez*, 287 F. Supp. 2d at 984 (quoting *Baldwin*, 6 F. Supp. 2d at 835 (N.D. Iowa 1998)).

13

The FLSA, however, exempts certain jobs from the overtime pay requirement. 29 U.S.C. § 213. As is relevant to this matter, the FLSA includes an exemption for "any employee employed in agriculture[.]" *Id.* § 213(b)(12). The FLSA defines "agriculture" as follows:

> (f) "Agriculture" includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities, . . . the raising of livestock, bees, fur-bearing animals, or poultry, and any practices . . . performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.

*Id.* § 203(f).

The corresponding regulations provide further guidance on how agriculture is interpreted for FLSA purposes. The Court will consider the corresponding regulations in more detail in its discussion of whether plaintiff was engaged in agriculture. In short, however, the Secretary of Labor's regulations distinguish between primary and secondary agriculture. 29 C.F.R. § 780.105. According to the regulations, the definition of agriculture has two distinct branches: "One has relation to the primary meaning of agriculture; the other gives to the term a somewhat broader secondary meaning for purposes of the Act." *Id.* § 780.105(a).

### 2. Interpretation and Application of the Statute

As the statute's language suggests, the agricultural exemption is broad and "was meant to embrace the whole field of agriculture." *Maneja v. Waialua Agric. Co.*, 349 U.S. 254, 260 (1955). The agricultural exemption is not limitless, however, and courts are still "left with the problem of what is and what is not properly included within that term." *Id.*

Courts that have considered "what is and what is not properly included within" the agricultural exemption have explained that the FLSA definition of agriculture "includes farming in both a primary and a secondary sense." *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 398 (1996) (quoting *Bayside Enters. Inc. v. NLRB*, 429 U.S. 298, 300 (1977)). For example, In *Holly Farms v. NLRB*, the United States Supreme Court reviewed a decision by the National Labor Relations Board ("NLRB") approving an agreement that excluded chicken transporters from the agricultural exemption. *Id*. at 396. The *Holly Farms* employees were live-haul chicken transporters whose responsibilities consisted of driving flat-bed trucks to farms of independent chicken growers, catching the chickens, loading them into cages, lifting the cages onto the truck beds, and then driving the chickens to the processing plant for slaughter. *Id*. at 395-96.

The *Holly Farms* court explained the agricultural exemption is divided into two branches. First, "[p]rimary farming includes the occupations listed first in § 3(f)." *Id*. at 398. This includes "the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities . . . [and] the raising of livestock, bees, fur-bearing animals, or poultry." *Id*. (quoting 29 U.S.C. § 203(f)). Secondary farming, however, has a broader meaning. *Id*. It encompasses the second part of Section 203(f) and includes "any practices . . . performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market." *Id*. (quoting 29 U.S.C. § 203(f)). Applying this reasoning the court first found the haulers were not engaged in primary agriculture because the live-haul employees were not engaged in raising poultry. *Id*. at 400. Next, the court found the live-haul activities were not activities performed by a farmer. *Id*. Finally, the court found live-haul employee's activities were not incident to or in conjunction with the farming

15

operations. *Id.* at 403. Thus, the live-haul transporters were not subject to the agricultural exemption.

Courts in this District have engaged in an agricultural employee analysis on at least two occasions. First, in *Baldwin v. Iowa Select Farms, L.P.* the court considered whether an employee who worked with pigs on a sow farm should be considered an agricultural employee. *Baldwin v. Iowa Select Farms, L.P.*, 6 F. Supp. 2d 831 (N.D. Iowa 1998). In *Baldwin* the plaintiff was employed as a "Sow Farm Technician." *Id.* at 833. The plaintiff had a long list of responsibilities that included, among other things, feeding animals, providing water for the pigs, treating sick animals, managing the facilities to provide a healthy environment for the pigs, and monitoring animal movement. *Id.* As is the case here, the hog farms in *Baldwin* were also fragmented based on various stages on the pigs' lives. *Id.* at 834-35. The plaintiff argued that because she only worked with the pigs at the first stage of production—which meant she was typically only around each pig for 16 days—she did not care for the animals for a substantial period of time and thus was not an agricultural employee. *Id.* at 842. The court was unpersuaded by plaintiff's argument and found that plaintiff was engaged in primary agriculture because she was "engaged in the 'primary' agricultural activity of 'raising livestock,' and because its operations 'relate to animals of the type name and constitute the "raising" of such animals.'" *Id.* (quoting 29 C.F.R. § 780.119). The court did not conduct a secondary agriculture analysis because it already found plaintiff was engaged in primary agriculture. *Id.* at 842.

Second, in *Jimenez v. Duran* the court considered whether employees who were contracted to work with chickens were agricultural employees. *Jimenez v. Duran*, 287 F. Supp. 2d 979 (N.D. Iowa 2003). In *Jiminez* the plaintiffs were employed by a company that was contracted to inoculate chickens for various diseases, debeak chickens, move chickens from pullet sites to layer barns, and crate chickens before they are taken

to market by other contractors. *Id.*, at 983. Plaintiffs did not load or unload trucks used to carry the chickens, nor were they involved in trucking any of the chicks or chickens for processing. *Id.* The court found plaintiffs were engaged in both primary agriculture and secondary agriculture. They were engaged in primary agriculture because "[a]lthough the [plaintiffs] were not employed to feed and water the poultry on a daily basis, or to provide other 'daily' care, the undisputed record is that they were employed in other routine, but periodic and labor-intensive, phases in the general care of poultry[.]" *Id.* at 987. They were also engaged in secondary agriculture because they were doing work that was performed on a farm and in connection with farming operations. *Id.* at 989.

Although the Court is not bound by these decisions and the factual circumstances of the present matter are different than those found in the above cases, the cases do provide the Court with guidance. They provide examples of what falls within the agricultural exemption (i.e., sow farm technicians and contract poultry caretakers), and what falls outside the exemption (i.e., live-haul poultry transporters).

### 3. *Applicability of the Exemption Here*

As explained above, courts analyzing the agricultural exemption proceed in two steps. *Baldwin*, 6 F. Supp. at 837. First, courts consider whether the employee was engaged in "primary" agriculture. *Id.* If the answer to the first question is no, then courts consider whether the employer was engaged in "secondary" agriculture. *Id.* Thus, the Court will first consider whether plaintiff was engaged in "primary" agriculture and will then turn to "secondary" agriculture.

### a. *Primary Agriculture*

Primary agriculture includes the occupations listed in the first half of Section 203(f). This includes the cultivation and tilling of soil, dairying, the production, cultivation, and harvesting of agricultural commodities, and the raising of livestock. The

17

federal regulations clarify portions of the primary agriculture definition. Regarding "raising of livestock," the regulations provide: "Employees are employed in the raising of livestock . . . only if their operations relate to animals of the type named and constitute the 'raising' of such animals." 29 C.F.R. § 780.119. The term "livestock" is "confined to the ordinary use of the word and includes domestic animals ordinarily raised or used on farms" including "[c]attle (both dairy and beef cattle), sheep, swine, horses, mules, donkeys, and goats." *Id.* § 780.120. The regulations further define raising of livestock and state that raising livestock "includes such operations as the breeding, fattening, feeding, and general care of livestock." *Id.* § 780.121. The regulations also provide some examples of what is not included in raising livestock. For example, raising livestock does not include individuals employed in places such as "in the pens of stockyards or the corrals of meat packing plants where they are confined for a period of a few days while en route to slaughter or pending their sale or shipment." *Id.*

Defendant argues that plaintiff was engaged in primary agriculture. First, defendant argues that defendant, as the employer, engages in primary agriculture because it breeds, raises, and finishes hogs for processing. (Doc. 22-1, at 12). Next, defendant argues that plaintiff, as the employee, was engaged in primary agriculture. According to defendant, "Plaintiff was involved in Cactus' general care of its animals through oversight of load crews [who] loaded the animals for transport at various stages of their development." (*Id.*, at 14).

Plaintiff agrees that defendant engages in activities that constitute primary agriculture. (Doc. 37, at 5). Indeed, plaintiff agrees that defendant breeds, fattens, feeds, raises, and provides general care of livestock and thus is engaged in primary agriculture. (*Id.*). Plaintiff, however, argues that the agricultural exemption is not focused on the employer, but instead depends on the activities of the employee. (*Id.*). Plaintiff asserts that his responsibilities and duties cannot reasonably be considered

18

"raising livestock." (*Id.*). Specifically, plaintiff asserts his time around the animals was limited in duration and largely amounted to "observing and documenting various aspects of the process contract growers followed" when loading pigs onto trucks. (*Id.*). According to plaintiff, this does not amount to raising livestock.

Defendant also highlights that plaintiff's position was called "Animal Care Auditor," which implies plaintiff's employment was focused on animal care. (Doc. 22-1, at 14). It is true the job title implies plaintiff was involved with animal care, but although a job title is relevant to the analysis, a job title alone is not itself enough to find plaintiff was engaged in primary agriculture. *Cf.* 29 C.F.R. 541.2 ( in determining exemptions for executive, administrative, professional, computer and outside sales employees, "A job title alone is insufficient to establish the exempt status of an employee. The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part."). Using a job title as evidence that plaintiff was engaged in animal care could encourage employers to develop creative job titles aimed at getting around the FSLA overtime requirement. The Court must instead consider the actual responsibilities assigned to and performed by plaintiff. *See Buford v. Superior Energy Serv., LLC*, Case No. 4:17-cv-00323-KGB, 2018 WL 2465469, at *6 (E.D. Ark. June 1, 2018) ("Job titles are not determinative; rather, it is the employee's salary and primary duties that determine his qualification as an exempt employee [under the FLSA]."). The Court must also consider whether plaintiff's responsibilities *actually* provided care for the animals or whether the duties *merely related* to animal care.

As an Animal Care Auditor plaintiff had several distinct responsibilities. First, plaintiff conducted vaccination assessments. (Doc. 37-1, at 13). Second, plaintiff performed a small number of transportation and biosecurity audits. (*Id.*, at 14). Third, plaintiff performed power washing assessments. (*Id.*, at 15). Finally, plaintiff performed

19

load assessments. (*Id.*, at 16). Neither party asserts that the power washing, vaccination, or biosecurity assessments provided general care for the animals. Also, plaintiff devoted approximately 80 percent of his time conducing load assessments. Thus, the question turns on whether plaintiff provided general care for the animals when he conducted load assessments.

Both parties agree that as an Animal Care Auditor plaintiff observed how load crews moved pigs between barns and transport trucks, sorted the animals, and handled the pigs. (*Id.*, at 19). More specifically, plaintiff assessed the barn and pathways to make sure there were no broken gates, sharp objects, or angles that could harm the animals. (*Id.*, at 21). Plaintiff also assessed the building's lighting and air pressure to make sure the building conditions were appropriate for housing and moving pigs. (*Id.*). In addition to assessing the building, plaintiff also assessed the load crews. For example, plaintiff assessed how many members were part of a load crew to make sure there was appropriate help to safely load the animals. Plaintiff also assessed how frequently the load crews shocked the animals using an electric shocker because shocking the animals can negatively impact the animal's safety. (*Id.*). Plaintiff also assessed the crew's attitude and the impact their tone and efforts had on the animals. (*Id.*).

Based on the undisputed description of job responsibilities the Court finds plaintiff was engaged in general care of the animals. On the one hand, plaintiff's responsibilities functioned as a form of quality control that was meant to ensure quality meat was sent to the processing facility and meat packer. (*Id.*, at 24). That one of the position's objectives was to ensure quality meat was sent to the processing facility does not preclude a finding that plaintiff was also responsible for providing care for the animals. Indeed, each of the responsibilities and actions provided care for the animals. For example, plaintiff's checking for sharp edges necessarily indicates he was protecting the welfare of the animals by making sure they would not be harmed or injured by a protruding object.

20

Also, by observing the loading crews to make sure they were not excessively shocking the animals, plaintiff was ensuring the animal's safety because over-shocking the animal can have a negative impact on the animal's health. Similarly, monitoring the load teams for crew size and vocal tone was intended to make sure the animals did not become stressed and overheated. The care was not provided in a traditional sense of feeding and watering the animals, but the nature of agriculture has changed such that there are many ways an individual can provide general care for an animal. Here, the undisputed facts show plaintiff was providing care.

Evidence in the record further provides that plaintiff was caring for the animals. First, depositions indicate the position was designed to provide care for the animals. According to Stefanie Wisdom ("Wisdom"), who was the animal care coordinator for defendant, the reason for the load assessments was for the "health and welfare" of the animals. (Doc. 22-3, at 21). Wisdom testified that the assessor is "there to watch the animal-handling and watch to make sure [the] investment gets on the truck safely," but also to pay attention to "everything else that is going on in the barn" to protect the health of the pigs. (*Id.*). Similarly, Mike Weinzetl ("Weinzetl"), another Animal Care Auditor, stated that the purpose of load assessments was to make sure pigs were being treated in a safe and humane manner. (*Id.*, at 78). Stated differently, when the load assessments were properly conducted, they were intended to provide care for the animals and to ensure the pigs' welfare.

Second, plaintiff's own deposition testimony indicates he was caring for the animals. Plaintiff testified at his deposition that the purpose of a load out assessment is "[t]o ensure the well-being of the animals getting in there." (*Id.*, at 57). Plaintiff further testified that he would step in and correct issues with loading if there was an animal welfare issue. (*Id.*). For example, plaintiff testified that he stopped a load because the loading structures were in poor shape and using the structures endangered the pigs. (*Id.*).

Plaintiff also testified that when he saw things like a crew excessively shocking pigs and harming the pigs, he would direct the loading crew to back off. (*Id.*). Based on his own testimony, plaintiff claims his job was to look out for the well-being of the animals and that he would take necessary action to prevent harm and provide care for the animals.

Third, the assessment forms plaintiff filled out show that plaintiff was not a mere bystander or passive observer who merely reported events to management at a later time. Instead, they paint a picture of an employee who was actively involved in making sure the animals were properly cared for. The parties provided a significant number of assessment forms that were filled out by plaintiff. It would be impractical to discuss each form, but a random sampling leads the Court to conclude plaintiff was actively engaged in overseeing the loading process. For instance, on March 14, 2017, plaintiff noted in the comments of his assessment form that he "talked with crew leaders abought [sic] way to [sic] much shocking and pushing way to [sic] hard and it didn't get much better." (Doc. 26, at 227.) On one humid day in March 2017, plaintiff had an employee "go and get a hose to water pigs." (*Id.*, at 236). On another occasion (date not given), plaintiff intervened to stop an employee from using a shocker on the pigs. (*Id.*, at 272). On May 2, 2017, plaintiff noted in his assessment that the loading crew "did start out in a hurry but I asked them to slow down and they did. . .. Some of the pigs were tired when they got to the door." (*Id.*, at 344). There are many more examples of plaintiff's intervention in the loading process. (*See, e.g.*, *id.*, at 473). There are also many assessments without additional comments or notes. (*See, e.g.*, *id.*, at 356, 365, and 392). The Court, however, did not struggle to find examples of instances when plaintiff spoke with the crew and directly intervened to provide better care for the animals. This supports a finding that plaintiff was not a passive bystander whose only role was to watch and take notes. Instead, it shows he was involved with the welfare of the animals and provided both guidance and hands-on support to ensure the safety and well-being of the animals.

22

Plaintiff testified that most of his assessments were load-out assessments conducted on finishing farms. In other words, most of plaintiff's assessments were for pigs that were leaving the barn to go to the processing facility. Because the pigs were leaving to be processed, there is a strong counterargument that the welfare of the animals was no longer an issue and plaintiff's job was primarily to ensure the pigs made it to the processing facility alive so they could be slaughtered and processed. Wisdom's testimony, for example, indicates that there may be less of a need for animal welfare when the pigs are on the last stage of their lives and the only remaining thing to do is die. According to Wisdom, when a pig is taken from the barn to the processor there is going to be a commingling of pigs at the packer and it is dirty. (Doc. 22-3, at 13). Further up the line is where you get the cleanest and healthiest animals. (*Id.*). In short, providing care for a pig is most important before it is sent to a processing plant.

Even if a majority of the assessments plaintiff completed were for pigs that were on the final stage of their growth and were headed to the processor, plaintiff was still providing care for the animals while they were being moved and handled. Also, there is evidence that the load assessor was not just caring for the animals that were being loaded to go to the processor. According to Roberto Eizmendi ("Eizmendi"), the general manager of defendant's pork division, the load assessment is also meant to protect the pigs that remain in the barn. (Doc. 22-3, at 36) ("If the person doing the process of removing the animals designated for loading, they misbehave within the pens and get the population extremely excited, they can hurt themselves by running and hitting the fences, overheating, even dying."). Indeed, plaintiff admits that the load assessments also were for the well-being of animals who remained in the barn and were not loaded for transport. The pigs had to be kept calm and stress-free during the process so they would not get stressed and harm themselves or the other pigs. Thus, the assessor was not just interested

23

in the well-being of the pigs going to slaughter, but was concerned about the other pigs that remained in the barn as well.

The load assessments do not reflect traditional ideas of general care of animals in the same way it would if plaintiff was feeding, watering, and cleaning the animals. The nature of agriculture, however, has changed in significant ways that change the types of positions and jobs that are needed to care for animals. It is not dispositive that the responsibilities do not conform with traditional understandings of caring for animals. *See Farmers Reservoir & Irrigation Co. v. McComb*, 337 U.S. 755, 760-62 (1949) (explaining that as agriculture evolves, so do the jobs society associates with agriculture). Modern pork production has undergone significant changes in recent decades and many farms now use the same method used by defendant. This shift inherently means pigs will be transported on semi-trucks and trailers from barn to barn and from barn to processing plant. Keeping the animals alive and healthy during the transport has become a necessary part of agricultural pork production. Caring for livestock extends beyond traditional notions and to plaintiff's position here.

Thus, the Court finds plaintiff was engaged in primary agriculture.

### b. Secondary Agriculture

Under the two-step analysis used to determine whether an individual is an agricultural employee courts only need to consider whether the individual is involved in secondary agriculture if the individual is not engaged in primary agriculture. *Baldwin*, 6 F. Supp. 2d at 837. The Court has already found plaintiff was engaged in primary agriculture and thus, the Court need not consider a secondary agriculture analysis. As an alternative to the primary agriculture analysis, however, the Court will also consider whether plaintiff was engaged in secondary agriculture.

Secondary agriculture includes the occupations listed in the second half of Section 203(f). This includes activities "performed by a farmer or on a farm as incident to or in

conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market." 29 U.S.C. § 203(f). In other words, plaintiff must either be employed in work performed by a farmer or be employed in work on a farm. An employee only needs to fall within one of the two categories, but under each category the work must be performed as an incident to or in conjunction with farming operations.

### i. By a Farmer

The Court turns first to the "performed by a farmer" branch of the secondary agriculture analysis. Defendant argues plaintiff's work was performed by a farmer. (Doc. 22-1, at 16). According to defendant, defendant was the farmer at all the Cactus owned and operated facilities at which it was raising livestock. (*Id.*). Plaintiff was an extension of defendant and thus defendant argues plaintiff should be considered a farmer. Defendant also argues that on the contract-farms the contract growers were responsible for the load out phase. (*Id.*). According to defendant, plaintiff was assisting the farmer in the load out process on contract farms and was thus, also a farmer. Plaintiff, however, argues that under United States Supreme Court precedent defendant should not be considered a farmer. (Doc. 37, at 9). According to plaintiff, "when an employer contracts with independent growers for the care and feeding of the employer's [livestock], the employer's status as a farmer engaged in raising [livestock] ends with respect to [that livestock]." (*Id.*) (quoting *Bayside Enters., Inc. v. N.L.R.B.*, 429 U.S. 298, 302 n.9 (1977)). Plaintiff asserts that here defendant lost its status as a farmer when it contracted with grower farmers. (*Id.*). Also, plaintiff did a majority of his work with contract farms and thus, he should not be considered a farmer. (*Id.*).

In *Bayside Enterprises, Inc. v. National Labor Relations Board* a company owned and retained title to chickens, but contracted with independent farmers to house and care for the chickens. *Id.* at 302. The company "deliver[ed] the chicks to the independent

farms when they [were] one day old and pick[ed] them up for processing about nine weeks later." *Id.* at 301-02. The company also owned a poultry feed mill and "the processing plant in which it slaughters and dresses poultry." *Id.* at 301. The Court affirmed the NLRB's conclusion that "when an employer contracts with independent growers for the care and feeding of the employer's chicks, the employer's status as a farmer engaged in raising poultry ends with respect to those chicks." *Id.* at n.9 (quoting *Imco Poultry*, 202 N.L.R.B. 259, 260 (1973)). Based on this finding, the court concluded that truck drivers who transported feed and the chickens were not agricultural workers because their employers—who retained title to the chickens but did not care for them— were not engaged in an agricultural activity once they delivered the chicks to the farms. *Id.* at 303.

Here, there is no real dispute that at defendant-owned and operated facilities defendant was a farmer because defendant was itself raising livestock. A majority of plaintiff's time conducting load assessments, however, was done at contract farms. (Doc. 37, at 10). Thus, the issue is whether plaintiff's work on the contract farms was done by a farmer. Based on the Supreme Court's reasoning in *Bayside*, defendant was no longer a farmer once they delivered the pigs to the control of the contract farms. Plaintiff was an extension of defendant when he was providing load out assessments at the contract farms and because defendant was not the famer in that setting, neither was plaintiff.

Defendant also asserts that plaintiff was acting on behalf of the contract growers when he was providing load assessments at contract farms. (Doc. 22-1, at 16). According to defendant, "the load out phase was the contract grower's responsibility and was performed by the farm's caretaker and crew or an outside crew was contracted for the job. Plaintiff was therefore assisting the farmer in the load out process on grower contract farms as well." (*Id.*). Defendant, however, offers no further explanation or support for its conclusion and the record supports a contrary finding. Plaintiff was told

by defendant which contract farms he should visit. It was also plaintiff's responsibility to arrange for visits with the contract farms. There is nothing that indicates the contract farms contacted either plaintiff or defendant for assistance in conducting the loads. Thus, there is nothing to support a finding that he was working on behalf of the contract growers and he should not be considered a farmer on a theory that he was an extension of them.

### ii. On a Farm

The Court must next consider whether plaintiff's work was done on a farm and incident to farming operations.

Defendant asserts the work was performed on a farm because "[p]laintiff performed the load assessments, vaccination assessments, cleaning assessment on all farms" and that the "assessments could only be performed on-site at the various farms." (Doc. 22-1, at 17). Defendant also argues this work was incident to and in conjunction with farming operations because the "loading of animals is an established and necessary part of the production process" and it is part of a farmer's responsibilities. (*Id.*, at 18). Plaintiff agrees that he did perform load assessments on farms but asserts that the time on the farms only accounted for a small amount of his days. (Doc. 37, at 10). Instead, plaintiff asserts he spent most of his time traveling to and from the farms so he does not qualify for the statutory exemption. (*Id.*). Additionally, plaintiff argues his work was part of shipping and marketing but was not incident to the farming operations of contract growers. (*Id.*, at 11).

First, the Court finds that plaintiff performed his work on a farm. There is no dispute that plaintiff spent time traveling to and from various assessment sites. The primary purpose of plaintiff's job, however, was performed on farms. The travel that occurred between the job sites and plaintiff's home was necessary but incidental to the actual job plaintiff was hired to perform. The result might be different if plaintiff was a truck driver, as in *Holly Farms*, who was hired to transport animals but was only briefly

27

at the farm.  But the opposite is true here.  The performance of plaintiff's job occurred on the farms while the driving was just a necessary component to get him there.  Thus, the Court finds plaintiff's work was performed on a farm.

Next, the Court finds the job was incidental to and in conjunction with farming operations.  Under Section 203(f), agriculture includes any practice performed "on a farm as in incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market."  29 U.S.C. § 203(f).  To be incident to or in conjunction with farming operations there must be something more than a connection to farming.  *Jimenez*, 287 F. Supp. 2d at 989 (citing 29 C.F.R. § 780.144).  "Generally, a practice performed in connection with farming operations is within the statutory language only if it constitutes an established part of agriculture, is subordinate to the farming operations involved, and does not amount to an independent business."  29 C.F.R. § 780.144.  Of further relevance, "the culling, catching, cooping, and loading of poultry" may qualify as agriculture under the secondary meaning of Section 203(f).  29 C.F.R. § 780.158(b).

Plaintiff's work was necessarily performed incidental to and in conjunction with farming operations.  At one point it would have been normal for a pig to be born on a farm and live its life there until it was sold for slaughter.  Agriculture has shifted in significant ways, however, and it is now commonplace for pigs to be raised on large operations and moved at various stages of their lives to different farms and the slaughterhouse on large transport trucks.  As a result, an established part of agriculture now includes loading of pigs onto trailers to move them around and in preparation for market.  It is a necessary step in the production of hogs and to transport them to market.  Also, whether informally or as a designated job, somebody needs to monitor the pigs being loaded to make sure they are properly cared for and reach market alive and well.  Also, even though the actions here involve pigs and not poultry, the activities are similar

28

to the regulation's findings that "loading of poultry" constitutes secondary agriculture. Plaintiff was part of the process of loading the pigs onto the trailer and his work should be considered in conjunction to agriculture.

For these reasons, plaintiff was engaged with work on a farm in conjunction with agriculture and is an agricultural employee under the secondary agriculture analysis as well.

### E.    Iowa Wage Payment Collection Act

Defendant also moves for summary judgment on plaintiff's IWPCL claim. (Doc. 22-1, at 24). Defendant argues that plaintiff's IWPCL claim is "entirely dependent on his establishing an overtime violation under the FLSA." (*Id.*). Because plaintiff cannot establish an FLSA overtime violation, defendant argues his IWPCL claim must fail as well. (*Id.*).

The IWPCL states in pertinent part:

> An employer shall pay all wages due its employees, less any lawful deductions specified in section 91A.5, at least in monthly, semimonthly, or biweekly installments on regular paydays which are at consistent intervals from each other and which are designated in advance by the employer.

IOWA CODE § 91A.3(1). Additionally, Iowa Code § 91A.8 states:

> When it has been shown that an employer has intentionally failed to pay an employee wages or reimburse expenses pursuant to section 91A.3, whether as the result of a wage dispute or otherwise, the employer shall be liable to the employee for any wages or expenses that are so intentionally failed to be paid or reimbursed, plus liquidated damages, court costs and any attorney's fees incurred in recovering the unpaid wages and determined to have been usual and necessary. In other instances the employer shall be liable only for unpaid wages or expenses, court costs and usual and necessary attorney's fees incurred in recovering the unpaid wages or expenses.

*Id.* § 91A.8. The IWPCL is a remedial statute. *Hornby v. State*, 559 N.W.2d 23, 26 (Iowa 1997). The statute "is designed 'to facilitate the collection of wages owed to

employees.'" *Jeanes v. Allied Life Ins. Co.*, 300 F.3d 938, 943-44 (8th Cir. 2002) (quoting *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 201 (Iowa 1997)). In other words, the IWPCL does not provide its own mandate to pay minimum wage or overtime, but instead helps employees recover the wages they were owed under other laws.

Because the IWPCL does not provide its own wage requirement but instead facilitates the collection of wages owed, plaintiff's IWPCL claim depends on the FLSA claim. The Court already found above that plaintiff is an agricultural employee and not entitled to overtime wages under the FLSA. The IWPCL cannot provide a means to collect wages which are not owed under another provision. Thus, defendant's motion for summary judgment on plaintiff's IWPCL claim is **granted.**

## IV.    CONCLUSION

For the reasons stated above the Court finds that plaintiff was an agricultural employee. Based on the Court's finding, the disposition of the various motions is as follows:

- Defendants' Motion to Amend Answers to Add Affirmative Defense is **denied.**
- Defendant's Motion for Summary Judgment is **granted and this case is dismissed.**
- Plaintiff's Motion for Partial Summary Judgment is **denied.**

**IT IS SO ORDERED** this 6th day of July, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

Case 3:19-cv-03021-CJW-MAR    Document 46    Filed 07/06/20    Page 30 of 30